KEITH H. KRETSCHMER AND ADINE W. KRETSCHMER, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Kretschmer v. Commissioner
Docket Nos. 26365-83; 4111-84; 23664-84; 15788-85; 21191-85; 46852-86
United States Tax Court
T.C. Memo 1989-242; 1989 Tax Ct. Memo LEXIS 242; 57 T.C.M. (CCH) 441; T.C.M. (RIA) 89242; May 16, 1989; As amended April 2, 1990 Mark Bernsley, for the petitioners. Gregory A. Roth, for the respondent. CLAPP
*245 MEMORANDUM FINDINGS OF FACT AND OPINION CLAPP, Judge: The cases in these consolidated proceedings are the lead cases in the tax shelter group known as Read Only Chips. Respondent determined deficiencies in petitioners' Federal income tax and additions to tax as follows: David and Marilyn Yanis - Docket No. 23664-84
Year
Deficiency
1979
$ 13,669
1980
12,766
In answer and amendments thereto, respondent asserted the applicability of sections 6653(a) [2] and 6621(c). [3]
Keith H. and Adine W. Kretschmer
Docket No. 26365-83
Addition to Tax
Year
Deficiency
sec. 6651(a)(1)
1978
$  45,950
$ 1,371
1979
47,680
871
1980
189,073
7,362
1981
63,696
2,125
Docket No. 46852-86
Additions to Tax sec.
sec.
sec.
sec.
sec.
Year
Deficiency
6653(b)(1) *
6653(b)(2) *
6621(c)
6659
6661(a)
1982
$ 223,194
$ 111,597 ** applicable
$ 18,806
$ 17,604
*246 In answers and amendments thereto, respondent increased the deficiencies and additions to tax and asserted the applicability of section 6621(c) for 1978 through 1981; section 6653(b) for 1978 through 1981 (or, in the alternative, section 6653(a) for 1978 through 1980, and section 6653(a)(1) and (2) for 1981) and section 6659 for 1981. Kenneth D. and Sandra G. Malamed
Docket No. 4111-84 Addition to Tax
Year
Deficiency
sec. 6653(a)
1979
$ 60,062
$ 3,003
1980
63,359
3,168
Docket No. 15788-85 Additions to Tax
sec.
sec.
sec.
sec.
sec.
Year
Deficiency
.6653(a)(1)
6653(a)(2)
6621(c)
6651(a)(1)
6659
1981
151,672
$ 10,097.85
**
applicable
$ 45,921.50
$ 8,763.00
1982
154,404
7,720.20
**
applicable
-0-
4,279.80
In his amendment to answer, respondent increased the deficiencies and additions to tax and asserted the applicability of section 6653(b) for 1979 through 1981 *247 and section 6653(b)(1) and (2) for 1982 (or, in the alternative, section 6653(a) for 1979 and 1980 and section 6653(a)(1) and (2) for 1981 and 1982); section 6661 for 1982 and section 6621(c) for 1979 and 1980. Carl N. Muchnick - Docket No. 21191-85
Addition to Tax
Year
Deficiency
section 6651(a)(1)
1981
$ 8,253
$ 1,050.60
In answer and amendments thereto, respondent asserted the applicability of sections 6653(a)(1), (a)(2), and 6621(c). This proceeding is concerned only with the portions of the deficiencies and the additions to tax relating to the purchase of certain computer software. Petitioners have conceded that they are not entitled to investment tax credits or to accelerated depreciation on the software. The issues remaining for decision are: (1) the ability of all petitioners to take depreciation, interest and other deductions related to the software; (2) the liability of Malamed and Kretschmer under section 6653(b) for additions to tax for fraud or, in the alternative, under section 6653(a) for additions to tax for negligence; (3) the liability of Muchnick and Yanis under section 6653(a) for additions to tax for negligence; (4) the liability *248 of Kretschmer and Malamed under section 6659 for additions to tax for valuation overstatements; (5) the liability of Kretschmer and Malamed under section 6661 for additions to tax for substantial understatements; and (6) the liability of all petitioners under 6621(c) for interest on substantial underpayments attributable to tax-motivated transactions. FINDINGS OF FACT This case involves over 800 pages of briefs, over 600 exhibits, nearly 1,100 pages of transcript, and opposing parties who agree on virtually nothing. We have attempted to limit our findings of fact to those facts which are material to the resolution of the case. Some of the facts are stipulated and are so found. The stipulation of facts and exhibits attached thereto are incorporated by this reference. At the time the petitions in these cases were filed, petitioners David and Marilyn Yanis were residents of Kings Point, New York; petitioners Keith H. and Adine W. Kretschmer were residents of Santa Monica, California (petition in docket No. 26365-83) and Hingham, Massachusetts (petition in docket No. 46852-86); petitioners Kenneth D. and Sandra G. Malamed were residents of Los Angeles, California; and petitioner *249 Carl N. Muchnick was a resident of Rancho Palos Verdes, California. For simplicity, the following discussion will treat the husbands as if they are the only petitioners in the case. This case involves two systems of computer software programs, the OPSCREEN system and the GAASS system. Each system will be discussed separately. I. OPSCREEN
Computer software is a sequence of instructions which tells a computer how to retrieve, manipulate, and store data in order to provide information to a computer user. Software is stored on a medium (such as a master tape or a chip) which is accessible by the computer. The Option Screening System (OPSCREEN) was a system of computer software programs designed to furnish various types of information to investors in options. The original OPSCREEN system was developed by David Bruce McMahan (McMahan), a stockbroker specializing in options. McMahan started working on the concepts underlying the OPSCREEN System in 1961 and first put the concepts on a computer in 1971. Around 1975, he put the programs on the Service Bureau Company (SBC) computer time-sharing network for his own use. A time-sharing company such as SBC makes available for *250 a fee the use of its large central computer, with the computer simultaneously processing a number of different software programs for different persons. Through the use of his programs, McMahan built his firm's previously nonexistent institutional options department to 22 clients and gross commissions in excess of $ 50,000 per month. In 1976, SBC expressed interest in moving McMahan's programs to its commercial library so that other brokerage firms could access the programs for a fee. At this time, SBC was one of the largest computer time-sharing vendors in the world and had a sales force of around 500 salesmen who marketed the various programs in its commercial library. In August 1977, McMahan granted SBC a nonexclusive license to make the original OPSCREEN programs available on its commercial library. The agreement provided that SBC would pay McMahan a percentage of the royalty payments it received for the use of the OPSCREEN programs and that McMahan would maintain (update and improve) the programs at his own expense. Subsequently, McMahan and James M. Russell (Russell), an attorney, decided to sell the individual OPSCREEN software programs. Each purchaser of a program acquired *251 a tangible medium, either a read only chip (ROC) or a master tape, on which his software program was encrypted. Each purchaser also acquired all rights relating to the program. The term "ROC" will be used to refer both to the chip (or tape) and the rights acquired by a purchaser. The original 21 OPSCREEN ROCs (OPSCREEN Series I) were offered for sale in 1977 and 1978. Another 16 ROCs (OPSCREEN Series II) were offered for sale in 1978. The ROCs involved in this case are the OPSCREEN Series III programs, which were developments of programs written by Kurt Hiebaum (Hiebaum), who was hired by McMahan in January 1978. As a condition of his employment, Hiebaum transferred his entire interest in his programs to McMahan. Before Hiebaum's programs were sold as OPSCREEN Series III ROCs, they were modified to be "user-friendly" so that they could be used by persons who were not computer experts. McMahan and Russell had initially planned to offer the Series III ROCs for sale in December 1978, but due to poor revenues they delayed the offering until June 1979. A few sales were made, however, before that time. A prospective purchaser of an OPSCREEN ROC received a confidential memorandum *252 which, among other things, contained a tax opinion and tables showing cash flow and tax benefits under scenarios where no revenues were received from the ROC, where revenues were sufficient to pay the notes in full, and where revenues equalled twice the amount needed to pay the notes. If no revenues were received, the tables indicated that an investment in a ROC priced at $ 100,000 would result in total tax benefits of $ 60,000 over the first 7 years of the investment. According to the tax opinion, the ROCs constituted "new" tangible personal property eligible for the investment tax credit and accelerated depreciation. Upon deciding to purchase a ROC, an OPSCREEN purchaser first executed a letter agreement which set forth the price and payment terms and which provided that the purchase was subject to the purchaser's receipt within the next 30 days of a complete set of documentation acceptable to the purchaser. The complete set of documentation included, among other documents, a purchase and sale agreement, the promissory notes, a security agreement, and two appraisals of the ROC. All of this documentation was dated as of the date on the letter agreement. In general, the letter *253 agreements were dated as of the date they were prepared for mailing to the purchaser. Some documents never were signed, and the purchasers often did not receive the complete set of documentation within the required 30-day period. OPSCREEN purchasers generally paid 7.5 percent of the purchase price at purchase, with another 7.5 percent due within 6 months pursuant to a short-term note. The remaining 85 percent of the purchase price was due pursuant to a 25-year recourse personal promissory note (recourse note) which was recourse as to principal and nonrecourse as to its 8-percent interest. There were mandatory payments on the recourse note to the extent of 70 percent of the ROC revenues allocated to the purchaser. In general, the mandatory payments on the recourse note were first applied to current interest, then to accrued but unpaid interest, and finally to principal. However, for the ROC entitled 20CALL, the mandatory payments were first applied to principal and then to interest. The recourse notes were secured by the tangible medium itself (the chip or tape) and by "additional collateral" that each ROC purchaser agreed to provide within 2 years from the date of purchase. *254 The required additional collateral was a deferred annuity in an amount equal to 10 percent of the ROC purchase price. At the time of the offering, interest rates were such that by the recourse note's maturity the deferred annuity would have grown from 65 percent to 75 percent of the principal amount due on the recourse note. In several instances, the purchaser was allowed to substitute other collateral for the deferred annuity. One form of substituted collateral involved a cash investment in the Cajun Energy 1981-A Limited Partnership (Cajun Partnership), which engaged in exploratory drilling on oil and gas properties. The Cajun Partnership was formed and promoted by McMahan and Russell, who owned the corporation which was the partnership's general partner. When an investment in the Cajun Partnership was used as additional collateral for a ROC investment, the income from the investment was assigned to McMahan and treated as prepayments on the recourse note. Purchasers of OPSCREEN ROCs received revenues from several different sources. The first source was the SBC time-sharing network. SBC generally retained 50 percent or more of the revenues it received and paid the remainder *255 to Responsive Securities Analysis Services, Inc. (RSAS) (owned 75 percent by McMahan and 25 percent by Russell). RSAS withheld a percentage (usually 10 percent) of its revenues for purposes of maintaining the OPSCREEN ROCs and distributed the remaining revenues (after withholding 70 percent for mandatory payments on the recourse note) to the OPSCREEN investors. The second source of OPSCREEN revenues resulted from the installation of the OPSCREEN system on computer systems other than SBC. Energy/Data Corporation (EDC) (owned 75 percent by McMahan and 25 percent by Russell) was granted the right to install the OPSCREEN software on such computer systems and in return would pay all of its revenues to RSAS. EDC also could receive certain oil revenues from McMahan and Russell if the EDC revenues allocable to a ROC were less than 10 percent of the ROCs' purchase price in any calendar year. These revenues also would be paid to RSAS. As compensation for its maintenance and marketing of the OPSCREEN ROCs, RSAS would retain a percentage of the revenues it received from EDC, with the remainder paid (after withholding 70 percent for mandatory payments on the recourse note) to the purchasers.
*256 The third source of OPSCREEN revenues was a "real-time" computer system established by McMahan and Russell. This system involved almost $ 1 million of time-sharing computer equipment that was managed and marketed by On Line Response, Inc. (OLR). The purpose of this arrangement was to allow the OPSCREEN system to use financial data that was continually updated during the day (real-time data) rather than data (such as on the SBC system) that was only updated daily. The arrangement with OLR was entered into in June 1980, and in July 1981 the first programs became available on the computer equipment. The ROC owners were to receive 45 percent of the net revenues (gross revenues minus certain minor costs) flowing from the OLR arrangement. The OLR arrangement never worked out as hoped and was discontinued on March 31, 1985. It initially had been hoped that the OPSCREEN system would become popular at a number of stock brokerage firms. However, OPSCREEN turned out to be a commercial failure. Well over half of its revenues during the years in issue were received from two stock brokerage firms for which McMahan worked or had worked. As a result of its poor performance, the OPSCREEN *257 owners recovered only a portion of their investments. For example, the purchase price of the OPSCREEN ROC known as NVRETPT was $ 94,000, yet its owner received net revenues of only $ 19,110 and a distribution of only $ 5,933 (the remainder went toward payment of the recourse note). OPSCREEN's lack of success was not due to deficiencies in the programs. For example, the City Employees' Retirement System for the City of Los Angeles considered five computer systems for use in connection with its option investing and decided that OPSCREEN was the best. As a result of daily use of OPSCREEN, the city raised the rate of return on its option portfolio by about 1 percent. Nor was OPSCREEN's failure due to a lack of marketing efforts. McMahan and Hiebaum spoke about OPSCREEN at seminars held by SBC in the Wall Street area for the major securities brokerage firms. In addition, Responsive Software Corporation (owned 80 percent by McMahan, 10 percent by Russell, and 10 percent by a third party), which performed the maintenance and development work on the programs for RSAS, engaged in extensive marketing and support activities, including both its own marketing efforts and assistance to SBC *258 representatives in sales calls. McMahan has repurchased between 10 and 15 percent of the OPSCREEN and GAASS ROCs from purchasers who were dissatisfied with their investments. Upon repurchase, the ROC owners were discharged from any liability to repay the recourse notes. The first repurchases occurred in December 1982. II. GAASS
In early 1978, McMahan met Milton Brafman (Brafman). Brafman had developed the Government and Agency Arbitrage and Swap System (GAASS system) for in-house use at Carroll McEntee & McGinley, Inc. (Carroll McEntee), his employer. GAASS was a system of computer software programs designed to provide various types of information regarding investments in government securities. McMahan liked the GAASS system because it provided information similar to that provided by the OPSCREEN system but in an area in which McMahan had no expertise. McMahan believed that the GAASS software could be sold in the same manner as the OPSCREEN software. However, Brafman held only a one-third interest in the GAASS system, with the remaining two-thirds' interest held by Carroll McEntee, his employer. Brafman purchased Carroll McEntee's interest for $ 407,360 in December *259 1979, and sold the programs to RSAS, which in turn sold them to the ROC purchasers. The price for which Brafman purchased Carroll McEntee's interest in the programs equalled 8 percent of the total price for which RSAS sold the ROCs. Before the sale of the programs, the programs were modified so that they were "user-friendly." The structure of RSAS' sales of the GAASS ROCs was essentially the same as the structure of the OPSCREEN sales, with similar payment options (except that a 15-percent cash payment was made at purchase, unlike the OPSCREEN arrangement of a 7.5-percent cash payment at purchase with another 7.5 percent due under a short-term note), the same additional collateral requirement on the recourse note, and the same application of 70 percent of a purchaser's revenues toward payment of the recourse note. As with the OPSCREEN transactions, the various documents often were dated as of dates prior to their execution. For example, the PSPD3 and PSPD5 purchase agreements, short-term notes and recourse notes were all dated November 16, 1979. Yet it was not until April 8, 1980, that Russell forwarded these unexecuted documents to the purchaser for his signature, with McMahan *260 executing the documents only upon their return by the purchaser. The GAASS programs ran on a computer time-sharing network operated by ADP/First Data Corporation (ADP). ADP had no marketing facilities of its own so all marketing of the GAASS system was done by Street Software Technology, Inc. (SST) (owned by Brafman). SST primarily marketed GAASS through its contacts with the Carroll McEntee organization. Users of GAASS would pay SST a fixed monthly fee. SST kept 20 percent of its gross revenues for expenses and a percentage (generally 10 percent) of the remaining revenues as a maintenance fee. The remainder (after mandatory payments of 70 percent on the recourse notes) was divided among the GAASS owners in proportion to the purchase prices of their ROCs. McMahan felt that the GAASS system would have more potential on the SBC system than on the ADP system. For this reason, the GAASS ROCs were licensed to SBC. SBC was to pay a portion of its revenues to Municipal Data Graphics, Inc. (MDGI), which was owned 50 percent by McMahan and 16-2/3 percent by Russell. MDGI would keep 20 percent of its gross revenues for expenses and a percentage (generally 10 percent) of the remaining *261 revenues as a maintenance fee. The remainder (after mandatory payments of 70 percent on the recourse notes) would be distributed to the GAASS owners. The GAASS system on the SBC computer was a commercial failure, with SBC receiving gross revenues of only $ 2,286 during the period from 1979 through 1985. The GAASS system on the ADP computer achieved somewhat more success as its subscribers included several financial institutions. However, none of the GAASS purchasers came close to recovering their investments in the GAASS ROCs. For example, the GAASS ROC known as PSPD3 sold for a price of $ 121,000. The PSPD3 owner received revenues of $ 46,631 for the years 1979 through 1986 (the year the GAASS system was removed from the ADP computer), but after required payments on the recourse note the total distributions were only $ 13,998. III. Petitioner Yanis
Petitioner David Yanis is an actuary and consultant with respect to pension and welfare plans and compensation programs. He first heard of the opportunity to purchase ROCs in late October 1979, during discussions with some of the partners at his firm. He found the tax advantages an attractive feature of the purchase and *262 decided to purchase the OPSCREEN ROC known as NVRETPT for $ 94,000. The terms were an initial cash payment equal to 7.5 percent ($ 7,050) of the purchase price, another 7.5-percent payment pursuant to a short-term note (with interest) due April 30, 1980, and the balance payable pursuant to a recourse personal promissory note due December 1, 2004. Yanis attempted to make the initial cash payment on his ROC by a $ 7,050 check dated November 12, 1979, but the check was returned for insufficient funds. Yanis paid the $ 7,050 principal and $ 263.20 interest due under the short-term note in mid-May 1980. In June 1981, Yanis acquired a $ 9,400 limited partnership interest (paid in full) in the Cajun Partnership and assigned a revenue interest therein to McMahan as additional collateral on the recourse note. On his 1979 Schedule C, Yanis reported no income from his ROC but a $ 8,285 depreciation deduction. In addition, he reported a $ 9,400 investment tax credit. On his 1980 Schedule C, he reported a total ROC income of $ 20 (consisting of gross receipts of $ 40 and a $ 20 cost of operations), and a total deduction of $ 24,768 (consisting of $ 24,490 of depreciation, $ 276 of interest, *263 and $ 2 of maintenance). His depreciation deductions were based upon a 7-year useful life and the 200-percent declining balance method. IV. Petitioner Kretschmer
From 1960 through 1968, petitioner Keith Kretschmer was executive vice-president and treasurer of an American Stock Exchange company providing computer services. In 1968, Kretschmer became a stockbroker and, in 1970, started specializing in options. Kretschmer's expertise in the area of options became sufficiently recognized for him to co-author a book on the subject and to testify as an options expert in court. Kretschmer extensively used the OPSCREEN programs in his business. A. 20CALL
Kretschmer purchased the OPSCREEN ROC known as 20CALL for the price of $ 84,750 and for tax purposes treated the purchase as occurring in 1978. The 20CALL letter agreement is dated December 29, 1978, and states that the ROC would be placed in service "on or before December 31, 1979." Both dates are handwritten. Kretschmer said that the date for placing the ROC in service should have been in 1978 rather than in 1979. In a letter dated March 2, 1979, Russell forwarded the other documents (all dated December 29, 1978) *264 to Kretschmer for his signature. The terms of Kretschmer's purchase provided for an initial cash payment of $1,000, with an additional $ 9,800 payment pursuant to two $ 4,900 short-term notes due on April 30, 1979 and October 30, 1979. The $ 73,950 balance was due on December 1, 2003 pursuant to a recourse note. Kretschmer allegedly gave McMahan a $ 1,000 check as the first payment on 20CALL in December 1978. However, the check is dated December 29, 1979, and was not cancelled by the bank. Kretschmer says that the check should have been dated December 29, 1978. Russell acknowledged receipt of a $ 1,000 check in a letter dated February 21, 1979. B. 20PUT and DIVPLUS
On June 28, 1979, Kretschmer purchased the OPSCREEN ROCs known as 20PUT and DIVPLUS for the respective prices of $ 104,000 and $ 59,000. The 20PUT terms of purchase were an initial cash payment of $ 650, with another $ 14,950 due on November 30, 1979 pursuant to a short-term note, and with $ 88,400 due on December 1, 2004 pursuant to a recourse note. The DIVPLUS terms of purchase were an initial cash payment of $ 350, with $ 8,500 due on November 30, 1979 pursuant to a short-term note, and $ 50,150 due on *265 December 1, 2004 pursuant to a recourse note. Kretschmer sent a $ 1,000 check dated June 28, 1979, and processed by the bank a few days later to Russell as the initial payment on the two ROCs. Kretschmer paid the short-term notes by a $ 23,450 check in November 1979. C. 20STRAD
On June 30, 1980, Kretschmer purchased the OPSCREEN ROC known as 20STRAD for $ 110,000. The terms of purchase were an initial cash payment of $ 500, with payments of $ 8,000 due on September 15, 1980 and February 15, 1981 pursuant to short-term notes, and $ 93,500 due on December 1, 2004 pursuant to a recourse note. The various documents were dated as of May 12, 1980, but it was in a letter dated June 12, 1980, that Russell sent the first documents to Kretschmer for his signature. The $ 500 payment was made by check dated June 30, 1980. The principal due on the first short-term note was paid in May or June 1981. The second short-term note for 20STRAD is marked "cancelled," but no check reflecting payment was introduced into evidence. D. Sales of 20CALL, 20PUT, DIVPLUS and 20STRAD, and Purchases of OPTVALS and FWDALPH
Kretschmer sold 20CALL, 20PUT, DIVPLUS, and 20STRAD to RSAS on December 9, 1982. *266 The agreements entered into in connection with the sale provided that RSAS would assume Kretschmer's liability under the recourse notes and also would assume the liability to provide the additional collateral (never provided by Kretschmer) for the notes. The agreements also provided that RSAS would pay $ 48,500 to Kretschmer. This payment was made on December 9, 1982. As part of the agreement to sell the four ROCs, Kretschmer agreed to purchase the OPSCREEN ROCs known as OPTVALS and FWDALPH and made the purchase on December 9, 1982. The purchase price was based upon the 1979 appraisals. The OPTVALS purchase required an initial cash payment of $ 7,650 and a $ 43,350 payment on December 1, 2007, pursuant to a recourse note. The FWDALPH purchase required an initial cash payment of $ 16,200 and a payment of $ 91,800 on December 1, 2007, pursuant to a recourse note. Kretschmer paid the $ 23,850 in cash with a check dated December 9, 1982. Under the terms of the agreement, Kretschmer would receive twice the otherwise applicable share of oil revenues from EDC. In March 1985, Kretschmer paid $ 12,900 for a $ 150,000 face value bond issued by the Housing Authority of the City of Santa *267 Rosa, California. In December 1986, Kretschmer assigned the bond to McMahan as additional collateral for the recourse notes. E. Kretschmer Joint Venture
In 1979, Kretschmer and three others formed a joint venture (Kretschmer Joint Venture) in which Kretschmer held a two-thirds' interest. The Kretschmer Joint Venture purchased the GAASS ROCs known as PSPD3 and PSPD5 on December 26, 1979. On behalf of the Kretschmer Joint Venture, Kretschmer submitted letter agreements dated as of November 16, 1979, for the purchase of these ROCs. The respective purchase prices were $ 121,000 and $ 112,000. The terms of the PSPD3 purchase consisted of an initial payment of $ 9,075, with a $ 9,075 payment due on April 30, 1980 pursuant to a short-term note, and a $ 102,850 payment due on December 1, 2004 pursuant to a recourse note. The terms of the PSPD5 purchase consisted of an initial payment of $ 8,400, with a $ 8,400 payment due on April 30, 1980 pursuant to a short-term note, and a $ 95,200 payment due on December 1, 2004 pursuant to a recourse note. The initial cash payments were made by two checks, one written by Kretschmer on December 26, 1979, and the other for the remainder written *268 by Kretschmer's partners. In December 1980, Kretschmer paid the principal and interest due under the short-term notes and asked the other partners to reimburse him for their one-third interest. In 1982, the Kretschmer Joint Venture provided the additional collateral for the recourse notes in the form of an Arkansas Housing Development Agency Bond in the face amount of $ 240,000. Kretschmer paid $ 16,000 of the $ 24,000 purchase price of the bond. F. Kretschmer's Schedules C
As an investment counselor, Kretschmer received commissions relating to the sale of OPSCREEN and GAASS ROCs and reported this income along with the ROC income on his Schedule C. In addition, although the Kretschmer Joint Venture owned the PSPD3 and PSPD5 ROCs, Kretschmer reported all profits or losses from these ROCs on his own return. In 1978, Kretschmer claimed depreciation of $ 4,000 and a qualified investment (for investment tax credit purposes) of $ 84,755 relating to his ROCs. He included the depreciation on Schedule F (Farm Income and Expenses) rather than on Schedule C. In 1979, Kretschmer's Schedule C reported a total income of $ 39,756 (solely gross receipts), $ 58,431 of deductions (commissions *269 of $ 7,044, depreciation of $ 49,978, interest of $ 959, and legal and professional fees of $ 450), and a qualified investment (for investment tax credit purposes) of $ 322,533, of which $ 318,333 was related to ROCs. In 1980, Kretschmer's Schedule C reported a total income of $ 72,163 (gross receipts of $ 81,780 minus a $ 9,617 cost of operations), $ 127,284 of deductions ($ 110,222 of depreciation, $ 14,393 of interest, $ 1,569 of maintenance, and $ 1,100 of legal and professional fees), and a qualified investment (for investment tax credit purposes) of $ 127,122, of which $ 110,000 was related to ROCs. In 1981, Kretschmer's Schedule C reported a total income of $ 41,237 ($ 48,686 of gross receipts minus a $ 7,449 cost of operations), and a total deduction of $ 104,055 (depreciation of $ 27,064, interest of $ 27,064, maintenance of $ 4,184, and legal and professional fees of $ 495). In 1982, Kretschmer's Schedule C reported total income of $ 29,391 (solely gross receipts), deductions of $ 101,105 (depreciation of $ 84,310, interest of $ 13,856, and administrative expenses of $ 2,939), and a qualified investment (for investment tax credit purposes) of $ 125,919, of which $ 106,000 *270 was related to ROCs. He also reported section 1245 recapture income of $ 215,001 from the sale of four of his ROCs and recapture of investment tax credits. Kretschmer's depreciation deductions were based upon a 7-year useful life and the 200-percent declining balance method, except for his depreciation deductions for FWDALPH and OPTVALS, which were based upon the 5-year ACRS method. V. Petitioner Malamed
From 1970 through the years in issue, Kenneth Malamed (Malamed) held an interest in the Lipman, Malamed, Norman & Sporl Partnership (LMNS Partnership), which was engaged in the investment counseling business. The other partners were Alan Lipman, Gerald F. Norman, Edward Sporl III, and (commencing in 1982) Alan Rudnick. On December 14, 1979, Malamed and his other partners formed a second partnership (LMNS Street Software Partnership) which, according to the partnership agreement, was "formed solely for the purposes of purchasing six (6) [ROCs] from [RSAS]." Malamed held a 28-percent interest in this partnership. On December 30, 1979, the partners of LMNS Street Software Partnership executed another partnership agreement which was essentially identical to the first one *271 except that it listed the Malamed Family Trust rather than Malamed as a partner. On December 1, 1984, the partners of LMNS Street Software Partnership (including the Malamed Family Trust) wrote a letter to McMahan's company in which they stated that "the partners of LMNS hereby assign our interest in the [ROCs] to the individual partners." The various ROC documents listed "Lipman, Malamed, Norman & Sporl" as the purchaser and contained no indication that the Malamed Family Trust was a partner in the purchase. On December 14, 1979, either LMNS Partnership or LMNS Street Software Partnership purchased the GAASS ROCs BYLDS, MCURV, SARBY, YSPD2, and CYSPD1 for the respective prices of $ 108,000, $ 84,000, $ 82,000, $ 94,000, and $ 101,000. The terms of purchase for each ROC were an initial cash payment of 15 percent of the purchase price, with the remaining 85 percent due on December 1, 2004 pursuant to a recourse note. The 15-percent cash payment ($ 70,350) on the ROCs was made in December 1979, by checks in the name of "Alan Lipman - Kenneth Malamed - Jerry Norman - Edward Sporl - Special Income Account." This account belonged to the LMNS Special Income Partnership, which was yet *272 another partnership in which Malamed had an interest. On January 11, 1980, either the LMNS Partnership or the LMNS Street Software Partnership purchased the GAASS ROC TYLDS for $ 126,000. The terms of purchase were a $ 900 cash payment, with another $ 18,000 due on July 1, 1980 pursuant to a short-term note, and the remainder due on December 1, 2004 pursuant to a recourse note. The $ 900 cash payment was made on February 26, 1980, by check drawn on the LMNS Special Income Account. The $ 18,000 amount due under the short-term note was paid in September 1980. Additional collateral for the SARBY recourse note was provided by the acquisition of an $ 8,200 interest in the Cajun Partnership in June or July 1981 and by assignment of a revenue interest in that partnership. Additional collateral for the other recourse notes was provided through the formation of a trust (Collateral Trust) which would invest in municipal bonds. The interest of the trustors in the Collateral Trust served as additional collateral for amounts due under the recourse notes. By check dated January 29, 1982, in the amount of $ 14,364, Malamed financed his proportionate share of the Collateral Trust. Malamed *273 reported the ROC purchases as being made by the LMNS Partnership, not the LMNS Street Software Partnership. Considering only those items related to the various ROCs, in 1979 the LMNS Partnership reported gross receipts of $ 763 and a qualified investment (for purposes of the investment tax credit) of $ 469,000. In 1980, it reported gross receipts of $ 26,780, total deductions of $ 190,983 (commissions of $ 5,354, repairs of $ 2,142, interest of $ 13,496, and depreciation of $ 169,991), and a qualified investment of $ 126,000. In 1981, it reported gross receipts of $ 38,050 and total deductions of $ 149,207 (consisting of repairs of $ 3,806, interest of $ 23,970, and depreciation of $ 121,431). In 1982, it reported gross receipts of $ 54,108 and deductions of $ 129,163 (interest of $ 27,256 and depreciation of $ 86,737). For each of the years in issue, Malamed reported his distributive share of the LMNS Partnership ROC income, deductions and credits. His depreciation deductions were based upon a 7-year useful life and the 200-percent declining balance method. VI. Petitioner Muchnick
Carl Muchnick is a pediatrician with no background or experience in the securities markets *274 or in data processing. He is a friend and client of Malamed and has purchased stocks and bonds with Malamed's advice. He purchased the GAASS ROC CSUM for $ 47,000. He treated the purchase as occurring in 1979, the year in which the various documents relating to the purchase were dated. On January 12, 1980, he paid $ 7,050 in cash by a check dated January 12, 1980, with the remainder due on December 1, 2004 pursuant to a recourse personal promissory note. During July 1981, Muchnick acquired a $ 4,700 interest in the Cajun Partnership. Subsequently, he assigned a revenue interest in that partnership as additional collateral for amounts due under the recourse personal promissory note. Muchnick did not report any ROC items on his 1979 return. In 1980, he reported total income of $ 400 and total deductions of $ 15,078. In 1981 he reported total income of $ 328 and total deductions of $ 9,453. His depreciation deductions were based upon a 7-year useful life and the 200-percent declining balance method. VI. Appraisals
Each of the ROCs at issue was appraised twice, usually by Jack Cooper (Cooper) and by John Gordon (Gordon). The appraisals were done independently of each *275 other, and the appraisers had not talked to the ROC promoters about possible prices. The price set for a ROC was no greater than the lesser of the two appraisals. Both Cooper and Gordon were familiar with financial software. Gordon had spent his entire career in the data processing field. At the time Gordon did the appraisals, he was evaluating software packages for a company that specialized in health systems management. Previously, he had worked at a private bank that provided investment advice to its clients. While there, he had been project manager in the development of a number of computer systems relating to the securities and investment business. After Gordon finished the appraisals, he was employed by McMahan, but this employment was independent of the appraisal activities. Cooper was an SBC marketing representative covering the Wall Street area from 1968 through late 1976. During his last 3 years with SBC, he marketed various software products to Wall Street firms such as Salomon Brothers and Merrill Lynch. After leaving SBC, he worked through early 1980 for Blythe, Eastman, Dillon & Co., where he was involved in financings for various governmental entities. *276 OPINION The issues for decision are (1) the ability of petitioners to take depreciation, interest and other deductions related to the ROCs; (2) the liability of Malamed and Kretschmer under section 6653(b) or, in the alternative, under section 6653(a); (3) the liability of Muchnick and Yanis under section 6653(a); (4) the liability of Kretschmer and Malamed under section 6659; (5) the liability of Kretschmer and Malamed under section 6661; and (6) the liability of all petitioners under section 6621(c). With the exception of the additional deficiencies and additions to tax raised by respondent in his amendments to answers and additions to tax under section 6653(b), petitioners have the burden of proof. Rule 142(a). The various issues will be discussed separately. I. Deductions
Respondent argues that petitioners' deductions should be disallowed in whole or in part because (1) the ROC transactions lacked economic substance, (2) petitioners lacked a profit objective, (3) the recourse notes should not be included in basis, (4) petitioners failed to establish certain requisites for the deductions, and (5) the at-risk rules disallow the deductions. A. Economic Substance
*277 If a transaction is entered into solely for tax benefits and without any other purpose, the form of the transaction will be disregarded and the tax benefits denied. Gefen v. Commissioner,87 T.C. 1471, 1490 (1986); Law v. Commissioner,86 T.C. 1065, 1093 (1986), on appeal (9th Cir., Dec. 29, 1986). A transaction will be recognized for tax purposes, however, if it has economic substance in that the transaction offers a reasonable opportunity for economic profit. Estate of Thomas v. Commissioner,84 T.C. 412, 438 (1985); Rice's Toyota World, Inc. v. Commissioner,81 T.C. 184, 203 n. 17 (1983), affd. on this issue 752 F.2d 89 (4th Cir. 1985). The fact that a transaction generates tax benefits for its investors does not necessarily mean that the transaction lacks economic substance. Frank Lyon Co. v. United States,435 U.S. 561, 581 (1978); Gefen v. Commissioner, supra;Estate of Thomas v. Commissioner, supra at 432. Key indicators of presence or a lack of economic substance include the relationship between sales price and fair market value, the structure *278 of the financing of the transaction, whether there was a shifting of the benefits and the burdens of ownership, the presence or absence of arm's-length price negotiations, and the degree of adherence to contractual terms. Rose v. Commissioner,88 T.C. 386, 410-411 (1987), affd. 868 F.2d 851 (6th Cir. 1989). Respondent argues that an analysis of these various factors suggests that the ROC transactions lacked economic substance. Each factor will be considered separately. 1. Fair market value
Respondent's brief extensively addresses the relationship between the sale price and the fair market value of the ROCs. At times respondent argues that the value of ROCs was the value determined by his expert; at times respondent argues that the value of the ROCs was only 30 percent of the value determined by his own expert; and at times, without mentioning the valuation of his expert, respondent argues that the ROCs were overvalued for various reasons such as the low price for which Brafman bought the GAASS system from Carroll McEntee. We need not attempt our own valuation of the ROCs by considering factors such as the low purchase price from Carroll McEntee *279 (which probably was due to Carroll McEntee's lack of any interest in marketing the programs) because both petitioners and respondent offered expert reports on the value of the ROCs. Respondent's expert was David Danner (Danner), who has a Ph.D. in systems engineering from Catholic University in Washington, D.C. Danner has worked in the computer business since 1970, and since 1975 has had his own computer consulting company, Ideamatics, which has appraised computer systems both for the government and private clients. Danner is an expert in computer systems and data processing but not in financial software or the market for financial software. According to Danner, at the time of purchase there was no reasonable expectation that the revenues of the OPSCREEN and GAASS ROCs would increase significantly from those already achieved because the ROCs would mostly be limited to markets developed by late 1979. This marketing limitation would be due in part to the increasing use of the personal computer, which would restrict the market for time-sharing systems such as GAASS and OPSCREEN. Danner believed that the increasing use of the personal computer in investment decision making could *280 have been predicted when the GAASS and OPSCREEN ROCs were purchased in 1979 and 1980. He supported his belief by citing three magazine articles, one of which appeared in "Forbes" magazine in August 1979 and had a picture of a Morgan Stanley employee who used an Apple computer to do stock trading, and also identified an options valuation model that could be run on a personal computer. Danner also believed that the GAASS and OPSCREEN systems faced a limited market because of competition from other financial software programs. He noted that a Merrill Lynch report published in February 1980 listed eight software systems dealing with options. The average expected revenues of those systems was $ 6,000. Danner assumed that these systems were competitive with the OPSCREEN system and, thus, that they limited potential OPSCREEN revenues. His assumption regarding the competitiveness of these programs contradicted the opinions of others, including testimony by Gordon and Cooper. Gordon testified that only three systems were competitive and none were significant competition. Cooper testified that the only competition was a much more expensive system not mentioned in the Merrill Lynch report. *281 John Driver, who was in sales management at SBC, said that OPSCREEN had no significant competition until after 1979. Petitioners' experts were Robert Anderson (Anderson) and Chapman Findlay (Findlay), who jointly prepared a report. Anderson has a Ph.D. in applied mathematics (computer science) from Harvard University. For the last 20 years he has worked for the Rand Corporation. During portions of that time he has headed, among others, Rand's Information Sciences Department and its Research Program in Computer Science. From 1968 to 1975, he was an adjunct Associate Professor of Computer Science at the University of California. Before Anderson prepared his portion of the expert report, he read the OPSCREEN and GAASS user's manuals and used the software. He also read the literature of the late 1970's and early 1980's. He concluded that the financial community viewed time-sharing systems as a viable means of providing computing services in the late 1970's and early 1980's. The popularity of personal computers was not foreseen at the time the ROC sales were made. Although a few analysts (such as the one in the Forbes article cited by Danner) had Apple computers on their desks *282 in 1980, this did not portend the personal computer explosion that occurred in the fall of 1981 when the IBM personal computer was introduced. Findlay has a Ph.D. with majors in finance and management from the University of Texas. He has been a tenured Professor of Finance in the Department of Finance and Business Economics at USC and also has been chairman of that department. Since 1985, he has been a self-employed consultant. After studying Cooper's and Gordon's appraisals of the ROCs, he concluded that Cooper and Gordon were competent appraisers, their methodology was appropriate, and their appraisals of the ROCs were reasonable and unbiased estimates of value, given what was known and knowable at the time. He felt that the ROCs could have turned out to be much more successful than contemplated by the appraisers and that the ROC sales were financially feasible independent of any tax considerations. He calculated that if the actual revenues had equalled those forecast by Gordon and Cooper, the required payment of 70 percent of the cash flow toward interest and principal would have retired most of the principal balance on the recourse notes in 4 or 5 years. We adopt the conclusions *283 of petitioners' expert witnesses (except, as noted below, their valuation of the ROCs Kretschmer purchased in 1982). We question the conclusions of respondent's expert witness for two reasons. First, respondent's expert witness admits that he is not an expert on financial software, yet his valuations of the GAASS and OPSCREEN ROCs are based on his view of the market for that software. By contrast, petitioners' expert witnesses were experts both on computers and finance. Second, respondent's expert believed that the use of the personal computer in investment decision making (and the resulting fall in the popularity of time-sharing systems) in the early 1980's could have been anticipated even before IBM introduced its personal computer. As support, he cited a few scattered magazine articles in 1978, 1979, and 1981. We question whether a few articles on any subject can be taken to accurately foretell a revolution in that field. We find more credible the testimony of petitioners' experts that at the time of the OPSCREEN and GAASS purchases it was entirely reasonable to expect the programs to increase in popularity, resulting in revenues close to, or above, those projected by the original *284 appraisals. Findlay noted that the market had changed by the time Kretschmer made his 1982 purchases of OPTVALS and FWDALPH. By that time the IBM personal computer had been introduced, and it was clear that the OPSCREEN and GAASS systems were not expanding their markets. Despite the change in the market, however, Kretschmer paid prices that were based on the 1979 appraisals. Findlay believed these appraisals were not valid in 1982. Accordingly, he attempted to determine the actual value of the OPTVALS and FWDALPH ROCs in 1982. He compared the benefit Kretschmer received from the transaction (the net cash he received plus the net reduction in debt) with his tax detriment (recapture of depreciation and investment tax credits on the software that he sold) and concluded that the minimum value of the two ROCs to Kretschmer in 1982 was $ 100,886, or about 63.5 percent of their purchase prices. However, Findlay did his calculation without knowing Kretschmer would testify at trial that he learned of the adverse tax consequences only after the transaction was completed. Since those adverse tax consequences were not considered by Kretschmer when determining what to pay, they are irrelevant *285 to a determination of the price he was willing to pay. Using Findlay's method of calculation, but ignoring the tax detriment, the minimum value of the ROCs to Kretschmer was only $ 4,389, or even less than the cash that Kretschmer paid for the two ROCs. The vast disparity between the price and the fair market value of these two ROCs is strong evidence of a lack of economic substance. 2. Financing
Respondent argues for two reasons that the 25-year recourse notes are unlikely to be paid and, thus, that the ROC transactions lack economic substance. First, he asserts that the recourse portion (the principal portion) of the notes never will be paid. With regard to the 1979 and 1980 transactions, there is no evidence to support this assertion. To the contrary, petitioners have testified that they intend to pay the notes, and McMahan has testified that he intends to collect. Such testimony is relevant. Taube v. Commissioner,88 T.C. 464, 485 (1987). Respondent points out that McMahan has repurchased some of the ROCs, thus discharging the owners from any liability under the recourse notes. There is no evidence, however, that such repurchases were contemplated *286 at the time the ROC sales were made. In addition, the existence of additional collateral for the notes increases the chance that the principal amount will be collected. Also, petitioners' expert witness noted that the mandatory payments on the recourse notes would have resulted in payment of most of the principal amount in 4 or 5 years if the investments had been as profitable as anticipated. Thus, we disagree with respondent's assertion that the recourse portion of the notes issued pursuant to the 1979 and 1980 purchases will never be paid. We agree, however, that the recourse portion of the notes issued pursuant to the 1982 purchases of OPTVALS and FWDALPH are unlikely to be paid. The two ROCs had a total purchase price of $ 159,000, yet according to the valuation technique used by petitioners' experts had a value of only a few thousand dollars. We also note that the ROCs' low value made them inadequate collateral for the notes, and it was not until December 1986, when this tax litigation was imminent that Kretschmer provided the additional collateral for the recourse notes. The validity of the purported debt is further cast into doubt by the fact that Kretschmer knew at *287 the time of the 1982 purchases that McMahan was willing to discharge the obligation under the recourse notes by repurchasing ROCs. We conclude that the 1982 recourse notes do not represent genuine debt. Second, respondent asserts that the nonrecourse interest on the notes never will be paid. As support, respondent refers to a discussion in Rose v. Commissioner,88 T.C. 386, 420 (1987), affd. 868 F.2d 851 (6th Cir. 1989), where it was thought significant that nonrecourse interest was unlikely to be paid. Respondent's argument ignores the fact that in Rose the assets were grossly overvalued, with virtually no chance that required payments out of revenues would be sufficient to pay the nonrecourse interest. By contrast, in the instant case the assets were correctly valued (with the exception of Kretschmer's 1982 purchases). According to petitioners' expert, at the time of sale it was likely that the nonrecourse interest would be paid from the gross revenues. Thus, the Rose discussion is inapplicable to the instant case. 3. Shifting of the benefits and burdens of ownership
There is no doubt that petitioners bore the benefits and burdens *288 of their ROC ownership. If the GAASS and OPSCREEN programs had been more successful than predicted, the owners would have benefitted from an increase in their values and would have received all revenues after the recourse notes were paid. The programs in fact were less successful than predicted, causing petitioners to bear the burden of the loss. Respondent attempts to analogize the ROC purchases to a sale leaseback transaction in which there is no shift in the benefits and burdens of ownership. Such an analysis is inappropriate given the facts of this case. 4. Arm's-Length Price Negotiations
Respondent next argues that there were no arm's-length price negotiations, citing Rose v. Commissioner, supra at 410-411. In Rose, the lack of arm's-length price negotiation was evidenced by the taxpayers' blind acceptance of exaggerated values claimed by the promoter. There was no independent valuation of the assets, and the taxpayers neither sought nor received information on ways to commercially exploit the property they acquired. By contrast, in the instant case in 1979 there were two independent appraisals of each ROC, and there was an existing arrangement *289 to market the software programs. Thus, in the instant case the requirement of arm's-length price negotiation was satisfied. 5. Adherence to Contractual Terms
Respondent points out that the parties did not adhere to the contractual terms in some respects, most quite minor. The most significant respect was Kretschmer's failure to provide the additional collateral for the ROCs that he eventually resold to McMahan, and Kretschmer's failure to timely provide the additional collateral for the two ROCs purchased in 1982. While the lack of adherence to contractual terms has some bearing upon the substance of the instant transactions, it is not enough to affect our conclusions regarding the nature of the transactions. 6. Other Arguments
Respondent also argues that McMahan's repurchases of certain ROCs (such as the repurchases from Kretschmer) indicate that the ROC transactions were a tax sham which failed. Although these repurchases may indicate that some purchasers were dissatisfied with their purchases, the dissatisfaction of the purchasers could just as easily be due to the ROCs' failure to make a profit as to the ROCs' failure to give big tax breaks. Respondent also *290 argues that since some petitioners did not attempt to resell their ROCs, their investment must have satisfied their expectations and, thus, must have been tax motivated. This argument has some plausibility but is relatively insignificant when compared with the evidence that most of the ROCs sold for their fair market values. 7. Conclusion
We conclude that the 1979 and 1980 transactions had economic substance. By contrast, the 1982 purchases of OPTVALS and FWDALPH lacked economic substance. In addition, the 1982 recourse notes did not represent genuine debt. B. Profit Objective
Respondent argues that petitioners were not engaged in an activity for profit within the meaning of section 183. We believe he is wrong with respect to the 1979 and 1980 purchases. There is no evidence that those purchases were anything other than bona fide business transactions. By contrast, respondent is right with regard to the 1982 purchases because those purchases were made at such inflated prices that they could not have involved a profit objective. Since the 1982 purchases lacked both a profit objective and economic substance, no depreciation deductions are allowable with respect *291 to those purchases. In addition, since the 1982 recourse notes were not genuine debt, no interest deductions are allowable with respect to those notes. Rice's Toyota World, Inc. v. Commissioner,752 F.2d 89, 96 (4th Cir. 1985), affg. in part and revg. in part 81 T.C. 184 (1983). C. Includibility of Recourse Notes in Basis
Even if the transactions did not lack economic substance, respondent argues that some or all of the recourse notes should be excluded from basis. As noted above, the 1982 purchases did lack economic substance. Even if they did not, however, there is a ground for excluding the 1982 recourse notes from basis. In Waddell v. Commissioner,86 T.C. 848, 903 (1986), affd. 841 F.2d 264 (9th Cir. 1988), we held that, with regard to a purported recourse note, if "on the basis of all the facts and circumstances we cannot conclude that payment of petitioners' purchase money note was reasonably likely, we cannot include the note as part of their basis for tax purposes." As noted above in the discussion regarding financing, various facts and circumstances suggest that the 1982 recourse notes are unlikely *292 to be paid. We conclude that the basis for OPTVALS was the $ 7,650 cash payment and the basis for FWDALPH was the $ 16,200 cash payment. Respondent also argues that we should exclude from basis a portion of the recourse notes associated with the 1979 and 1980 purchases even though payment is reasonably likely to be made on those notes. In Follender v. Commissioner,89 T.C. 943 (1987), the government made a similar argument with regard to notes on which the interest was nonrecourse. The government made its argument under section 483, which provides that a portion of the payments on certain deferred payment contracts must be treated as interest. For purposes of determining which portion will be treated as interest, section 483 does not consider any interest payments to the extent that they are contingent interest. Thus, if the interest payments on a deferred payment contract are contingent interest, section 483 will recharacterize a portion of the principal payments as interest, reducing the amount of principal that is included in basis. In Follender, the government argued that the interest payments were contingent interest because the taxpayer made mandatory *293 payments from gross receipts on the nonrecourse interest, causing the amounts and due dates of payments to be determined by the flow of gross receipts. We rejected the government's argument. We said that there was a definite date for repayment (the date all the interest must be paid), but with the possibility of earlier payment pursuant to the mandatory payment provisions. Thus, the nonrecourse interest was not contingent interest, and the entire principal amount of the notes was included in basis. A similar analysis applies in the instant case. C. Other Requisites for Deductions
Respondent argues that petitioners are not entitled to deductions with respect to their ROC investments because they have not established certain requisites for the deductions. First, he argues that they have not established the date on which they acquired the property. In support of this argument, respondent points out that many documents were dated prior to the date of execution. For tax purposes, however, all that is relevant is the date the purchase occurred, even if this differs from the date that documents were executed. For the most part, our findings of fact indicate the dates the various *294 ROCs were purchased and also the dates that the various payments were made for purposes of the at-risk rules. In several instances, however, our findings of fact lack certain dates because the facts are unclear. First, Yanis attempted to make the initial cash payment on his ROC by a $ 7,050 check dated November 12, 1979, but the check was returned for insufficient funds. The record does not disclose when the $ 7,050 payment actually was made, but we believe that it was made in 1979 and that Yanis' purchase occurred on November 12, 1979. Second, Kretschmer allegedly gave McMahan a $ 1,000 check as the first payment on 20CALL in December 1978. However, the check is dated December 29, 1979, and was not cancelled by the bank. Kretschmer says that the check should have been dated December 29, 1978. Russell acknowledged receipt of a $ 1,000 check in a letter dated February 21, 1979, and we have determined that this was the date the payment was made and also the date the purchase occurred. Third, there is no evidence other than Kretschmer's testimony regarding his payment of the amounts due under the 20CALL short-term notes, but because of Kretschmer's tardiness in paying other notes, *295 we believe that he made payment on those notes 1 year after the due dates. Fourth, the second short-term note for 20STRAD is marked "cancelled," but no check reflecting payment was introduced into evidence. The first 20STRAD short-term note was paid almost a year late. We believe that the second note, due in February 1981, was paid in February 1982. Fifth, Muchnick received an unexecuted CSUM letter agreement dated December 6, 1979, in a letter dated December 5, 1979. He also received various purchase documents dated November 16, 1979, in a letter dated December 6, 1979. We cannot determine from the various documents when the purchase actually occurred, so we hold that the purchase occurred on January 12, 1980, which is the date on the initial check. Second, respondent argues that petitioners have not established the dates on which the ROCs were first placed in service. For purposes of depreciation, property is first placed in service when it is "placed in a condition or state of readiness and availability for a specifically assigned function, whether in a trade or business, in the production of income, in a tax-exempt activity, or in a personal activity." Sec. 1.167(a)11(e)1, *296 Income Tax Regs. We conclude that all of the ROCs were first placed in service on the date they were purchased. Third, respondent argues that petitioners have not established their basis in the depreciable property. Respondent argues that petitioners acquired a bundle of rights and only some of those rights are depreciable. Specifically, he argues that petitioners' rights were predominantly related to revenue allocations from oil wells received from EDC. However, one may depreciate the right to an income stream. Tolwinsky v. Commissioner,86 T.C. 1009, 1052-1053 (1986). Respondent also states, without any explanation, that the ROCs should be depreciated under the income forecast method of depreciation. We conclude, however, that the ROCs should be depreciated under the straight-line method over a useful life of 7 years. Fourth, respondent notes that interest deductions are not allowable when indebtedness is continued to purchase obligations, the interest on which is wholly exempt from taxes. Sec. 265(2). Tax-exempt bonds were offered as additional collateral for certain of the recourse notes, and respondent accordingly argues that no deduction is allowable *297 for interest payments on the portion of those notes which equals the value of the tax exempt bonds. In this regard, the "legislative history of section 265(2) clearly reveals that Congress intended to disallow an interest deduction only upon a showing that the indebtedness was either incurred or continued for the 'purpose' of acquiring or holding tax-exempt obligations." Estate of Norris v. Commissioner,T.C. Memo. 1981-368. In accordance with this legislative intent, the courts have interpreted the statute as requiring a "purposive connection" or a "sufficiently direct relationship" between the taxpayer's indebtedness and his ownership of tax-exempt obligations. Swenson Land & Cattle Co. v. Commissioner,64 T.C. 686, 696 (1975); see also Wisconsin Cheeseman Inc., v. United States,388 F.2d 420, 422 (7th Cir. 1968); Baker v. Commissioner,75 T.C. 166, 172 (1980), affd. 677 F.2d 11 (2d Cir. 1982). Courts usually infer the requisite purposive intention where tax-exempt securities are used as collateral for the indebtedness. Levitt v. United States,517 F.2d 1339, 1344 (8th Cir. 1975); *298 Wisconsin Cheeseman v. Commissioner, supra at 422. Petitioners have the burden of showing that there is no purposive connection between the recourse notes and the tax-free bonds offered as additional collateral. Petitioners have not addressed this issue and, thus, have not carried their burden of proof. Accordingly, respondent prevails on this issue. Finally, respondent argues that Malamed is not entitled to claim any deductions or credits with regard to the ROC transactions because it was the LMNS Street Software partnership, not the LMNS Partnership, that purchased the ROCs. We are unable to determine from the record which partnership actually purchased the ROCs because some documents suggest that the purchases were made by the LNMS Partnership, and other documents suggest that the purchases were made by the LMNS Street Software Partnership. The resolution of this issue accordingly will be determined according to the burden of proof. With respect to the years 1979 and 1980, the notice of deficiency determined that the partnership losses "are not allowed because it has not been established that the partnerships paid any of the expenses giving rise to the losses." This determination *299 encompasses the theory that the actual purchase of the ROCs was by the LMNS Street Software Partnership rather than the LMNS Partnership. Accordingly, petitioner had the burden of proof for 1979 and 1980, and he has failed to carry that burden of proof. His failure to carry his burden of proof means that for purposes of deductions in 1979 and 1980, the LMNS Street Software Partnership will be treated as purchasing the ROCs. Because the Malamed Family Trust, and not Malamed, was the partner in the LMNS Street Software Partnership, and because Malamed has presented no evidence that he is entitled to the deductions of the Malamed Family Trust, Malamed's ROC deductions for 1979 and 1980 are disallowed. With respect to the years 1981 and 1982, the notice of deficiency disallowed the losses "because it has not been established that a proper cost basis, a proper method of depreciation and/or a proper useful life has been determined." The notice of deficiency did not determine that LMNS Partnership did not purchase the ROCs. It was only in the amendment to the answer that such an assertion was made. The burden of proof is on respondent with regard to any new matter raised in the answer. *300 Rule 142(a). Respondent's assertion is a new matter, because it requires the presentation of new evidence and does not simply clarify or develop respondent's original position. Achiro v. Commissioner,77 T.C. 881, 890 (1981). Accordingly, the burden of proof is on respondent regarding his argument that the LMNS Street Software Partnership, and not the LMNS Partnership, purchased the ROCs. He fails to carry his burden of proof and, thus, for purposes of deductions in 1981 and 1982, the LMNS Partnership is treated as purchasing the ROCs. D. At-Risk Rules
The only remaining issue regarding the deductions is the applicability of the at-risk rules. The at-risk rules apply to activities such as those in the instant case for taxable years beginning after 1978. Sec. 465(c)(3)(A). Because all of the ROC purchases occurred in taxable years beginning after 1978, petitioners will be allowed to deduct depreciation, interest, and other expenses relating to their ROC investments only to the extent that they are at risk with respect to their investments. Sec. 465(a)(1). Petitioners' at-risk amounts will generally include any amounts they borrowed with respect to *301 their investments, provided that they are personally liable for repayment. Sec. 465(b)(1) and (2). Such conditions are satisfied in the instant case. However, an exception to the general rule is provided by section 465(b)(3). Under that section, a borrowed amount shall not be considered to be at risk if that amount is borrowed from a person with an interest (other than an interest as a creditor) in the activity. A person who has a capital interest or a net profits interest in the activity will be considered to have an interest other than as a creditor. Levy v. Commissioner,91 T.C. 838 (1988); Larsen v. Commissioner,89 T.C. 1229 (1987); Waddell v. Commissioner,86 T.C. 848 (1986), affd. 841 F.2d 264 (9th Cir. 1988); Jackson v. Commissioner,86 T.C. 492, 529 (1986), affd. 864 F.2d 1521 (10th Cir. 1989). The OPSCREEN petitioners borrowed the amount of their recourse notes from McMahan and made mandatory payments of interest and principal to the extent of 70 percent of their net revenues. The GAASS petitioners borrowed the amount of their recourse notes from RSAS and made mandatory *302 payments of interest and principal to the extent of 70 percent of their net revenues. The question is whether the mandatory payments of interest and principal cause McMahan or RSAS to have a capital interest or a net profits interest in the activity. In order to have an interest in the net profits of the activity, McMahan and RSAS need not have any incidents of ownership. For example, "an employee or independent contractor any part of whose compensation is determined with reference to the net profits of the activity will be considered to have an interest in the net profits of the activity." Sec. 1.465-8(b)(3), Prop. Income Tax Regs., 44 Fed Reg. 32239 (June 5, 1979). In the instant case, the activity involved the furnishing of financial software. The net profits (the bottom line) of that activity were the revenues distributed to the ROC owners. Because a portion of those revenues were paid to McMahan and RSAS, McMahan and RSAS had an interest in the net profits of the activity. It might be asserted, however, that the mandatory payments did not give McMahan or RSAS an interest other than as a creditor because those payments merely were prepayments on an otherwise *303 existing liability. The validity of this argument need not be addressed because not all of the mandatory payments were prepayments on an otherwise existing liability. The interest payments on the notes were nonrecourse, and the limited collateral securing the notes meant that there was no chance that the interest would be paid unless the payments came from the mandatory payments out of net profits. Thus, the repayment arrangement was substantively the same as if McMahan and RSAS were entitled to receive 70 percent of net profits up to a certain level of profits, with their share of any profits above that level going toward repayment of the principal on the notes. It thus may be concluded that McMahan and RSAS had an interest other than as a creditor and, thus, petitioners are subject to the at-risk rules both on their short-term notes and on their recourse notes. [4] For the same result under similar facts, see Waddell v. Commissioner,86 T.C. at 915. In that case, a portion of net profits went toward repayment of principal on recourse notes. However, at the time of purchase the principal amount exceeded the fair market value of the asset. The creditor had an *304 interest in the net profits of the activity. We have noted that the apparent policy underlying section 465(b)(3)(A) -- was to exclude from at-risk amounts those amounts that are borrowed from creditors who, because of the nature of their continuing other interests in the activity, would not be likely to act as independent creditors with respect to the debt owed to them. * * * Creditors who hold recourse obligations, but who also have certain other interests in the activity, might disregard their rights thereunder in favor of protecting or enhancing their other interests in the activity. * * * [Bennion v. Commissioner,88 T.C. 684, 697-698 (1987.)] In the instant case, McMahan and RSAS have recourse obligations with respect to the principal, but "other interests" with respect to the payments of the nonrecourse interest. McMahan or RSAS could easily disregard their right to the recourse principal in the year 2004 in order to enhance their chance of receiving the nonrecourse interest in the present. For example, faced *305 with a disgruntled ROC owner who threatened to remove his software from the time-sharing systems, McMahan or RSAS would have an incentive to discharge some of the principal in return for a promise to keep the ROC on the time-sharing system, thus assuring that payments of the nonrecourse interest would continue. Finally, the interests of McMahan and RSAS in the software activity are unlike an ordinary creditor's interest. Normally, creditors received fixed payments that are unaffected by the profitability of the activity, with only the owner's revenues affected by profitability. In the instant case, however, McMahan and RSAS essentially are joint venturers who share in the activity's profits until the recourse notes are paid. Thus, McMahan's and RSAS' interests in the activity are much more similar to an owner's interest than to a creditor's interest. II. Additions to Tax
Respondent determined various additions to tax in his notices of deficiency, and he asserted other additions to tax in his amended answers. Each addition to tax will be considered separately. A. Section 6653(b)
Section 6653(b) provides for an addition to tax for fraud if respondent proves by *306 clear and convincing evidence that the taxpayer intended to evade taxes known to be owing by conduct intended to conceal, mislead or otherwise prevent the collection of such taxes. Rule 142(b); Stoltzfus v. United States,398 F.2d 1002, 1004 (3rd Cir. 1968). Respondent contends that this addition to tax applies to Kretschmer for the years 1978 through 1982, and to Malamed for the years 1979 through 1982. Respondent first argues that the various documents were backdated so as to fraudulently provide Kretschmer and Malamed with deductions for prior periods. However, we find little evidence that any petitioners intentionally used "as of" dates which were prior to the actual dates of purchase. Thus, respondent has not carried his burden of proving that the documents were dated with a fraudulent intent to evade taxes. Respondent next argues that Kretschmer and Malamed knew the ROCs were vastly overvalued. This argument could apply only to Kretschmer's 1982 purchases of OPTVALS and FWDALPH, as the other purchases were made at fair market value. With regard to Kretschmer's 1982 purchases, even petitioners' expert witnesses agree that the purchase price was substantially *307 above fair market value. Given Kretschmer's knowledge of options, his involvement with the sale of ROCs and his knowledge of the poor revenue history of the ROCs, it is likely that he knew that OPTVALS and FWDALPH were overvalued. However, we are unable to conclude that Kretschmer had fraudulent intent when he made the purchases. Respondent also argues that Kretschmer and Malamed knew that the ROCs were neither "new property" nor tangible property and, thus, they knew that they were not entitled to accelerated depreciation and investment tax credits. However, petitioners could have reasonably believed that the ROCs were "new property" because shortly before their purchase the programs had been made "user-friendly," and the tax opinion stated that the programs probably were "new property." In addition, during the years in issue it was unclear whether software was tangible or intangible property. Ronnen v. Commissioner,90 T.C. 74, 96 (1988). It was not until 1988 that we decided that software is intangible. Ronnen v. Commissioner, supra at 99-100. Respondent also claims that certain actions of Kretschmer were fraudulently intended to fool the *308 Internal Revenue Service (IRS). Kretschmer allegedly attempted to conceal the 20CALL ROC activity from the IRS by reporting the deductions and credits relating to that purchase on Schedule F rather than Schedule C; he allegedly attempted to give his activities the appearance of a profit motive by entering into the 1982 sales and purchases; and he allegedly attempted to make the ROC income appear more substantial than it was by reporting on Schedule C his commissions from the sales of ROCs. Respondent's arguments are unconvincing. Respondent also alleges that Malamed's ROC activities were fraudulently reported on the Malamed Partnership return (which had substantial income from non-ROC activities) rather than on the LMNS Street Software Partnership return so that the ROC deductions would appear more reasonable. This argument also is unconvincing. B. Section 6653(a)
Respondent contends that Kretschmer is liable for additions to tax under section 6653(a) for the years 1978 to 1982, Malamed is liable for the years 1979 through 1982, Muchnick for 1981, and Yanis for 1979 and 1980. Section 6653(a) applies if any part of any underpayment in due to negligence. As noted above *309 in our discussion of section 6653(b), petitioners could have reasonably believed that the ROCs were "new property" and that the ROCs were tangible property. Thus, it was not negligent for petitioners to take either the investment tax credit or depreciation under section 168. It was negligent, however, for Kretschmer to enter into the 1982 purchases at the grossly inflated prices. There are no other grounds for negligence. C. Section 6659
Respondent contends that Kretschmer and Malamed are liable under section 6659 for 1981 and 1982. Section 6659 imposes an addition to tax on those portions of an underpayment attributable to a valuation overstatement. A valuation overstatement will exist if the adjusted basis of property claimed on a return is 150 percent or more of the correct basis. Section 6659 applies to the underpayment attributable to the disallowance of the unconceded portion of the depreciation on Kretschmer's 1982 purchases but not to the underpayment attributable to the conceded portion of the depreciation or the conceded investment tax credit. McCrary v. Commissioner, 92 T.C.     (April 17, 1989). D. Section 6661
Section 6661 provides for an *310 addition to income tax in the case of a substantial understatement of tax. Under section 6661(b)(1)(A), a substantial understatement exists if the understatement of income tax exceeds the greater of 10 percent of the tax required to be shown on the return, or $ 5,000. Respondent contends that Kretschmer and Malamed are liable under this section for 1982. When making the Rule 155 computations, the parties will have to determine whether the mechanical requirements of this section apply to Kretschmer and Malamed. Section 6661 will not apply to that portion of the substantial understatement on which section 6659 imposes an addition to tax. Sec. 6661(b)(3). In general, section 6661 does not apply to the extent that the understatement is attributable to the tax treatment of any item if there is or was substantial authority for such treatment. Sec. 6651(b)(2)(B). Substantial authority for a position exists if "the weight of authorities supporting the treatment is substantial in relation to the weight of authorities supporting contrary positions." Sec. 1.661-3(b)(1), Income Tax Regs. With respect to the tangibility issue, there was substantial authority because at the time of the *311 purchase the only authority on the tangibility of computer software had held that such software was tangible. Texas Instruments Inc. v. United States,551 F.2d 599 (5th Cir. 1977), affg. in part and revg. in part 407 F. Supp. 1326 (N.D. Tex. 1976). As noted earlier, Ronnen v. Commissioner,90 T.C. at 74, was not decided until 1988. We conclude that there also was substantial authority for all other matters except Kretschmer's use of a basis in excess of fair market value on the 1982 purchases. Section 6661 imposes a stricter test in the case of a tax shelter, which is defined as a transaction whose principal purpose was the avoidance or evasion of Federal income tax. Sec. 6661(b)(2)(C)(ii). However, none of the ROC transactions were tax shelters within the meaning of section 6661(b)(2)(c)(ii). E. Section 6621(c)
Respondent alleges that Kretschmer for 1978 through 1982, Malamed for 1979 through 1982, Muchnick for 1981, and Yanis for 1979 and 1980 are liable under section 6621(c) for a higher rate of interest on understatements attributable to tax motivated transactions. A tax-motivated transaction includes a transaction *312 subject to the at-risk rules of section 465. Sec. 6621(c)(3)(A)(ii). The at-risk rules apply to all petitioners for all of the years in issue, so all petitioners are subject to section 6621(c). Appropriate orders will be issued. Footnotes
1. The following cases were consolidated for purposes of trial, briefing, and opinion: Kenneth D. Malamed and Sandra G. Malamed, docket No. 4111-84; David Yanis and Marilyn Yanis, docket No. 23664-84; Kenneth D. Malamed and Sandra G. Malamed, docket No. 15788-85; Carl N. Muchnick, docket No. 21191-85; Keith H. Kretschmer and Adine W. Kretschmer, docket No. 46852-86.↩
2. All section references are to the Internal Revenue Code of 1954, as amended and in effect for the years at issue. All Rule references are to the Tax Court Rules of Practice and Procedure. ↩
3. Formerly section 6621(d).↩
*. In the alternative, liability for additions to tax pursuant to section 6653(a)(1) and (2). ** 50 percent of the interest due on $ 71,084.↩
**. 50 percent of the interest due on the entire underpayment.↩
4. A similar analysis would apply to the 20CALL Note, which first applied the payments toward principal and then toward interest.↩